## No. 13,210.

THEDE ET AL. *v*. COLORADO NATIONAL BANK ET AL.

(22 P. [2d] 1105)

Decided May 29, 1933. Rehearing denied June 19, 1933.

Mr. E. CLIFFORD HEALD, Mr. JOSEPH E. NEWMAN, for plaintiffs in error.

Mr. ARCHIBALD A. LEE, for defendants in error.

*En Banc.*

MR. JUSTICE BUTLER delivered the opinion of the court.

THIS case involves a controversy between the holders of uncertified bonds and the holders of certified bonds. The former contend that they, as well as the latter, have a right to participate in the distribution of certain trust funds, and the latter deny the right of the former to so participate. The trial court held that the holders of uncertified bonds are not entitled to participate.

The Equitable Bond and Mortgage Company entered into an agreement with the Colorado National Bank, as trustee. The agreement recites that the company "has issued and will from time to time duly execute and issue" its savings bonds and its coupon bonds, and agrees "as security for all bonds delivered to it under the agreement, with the bank's certificate thereto affixed," to assign and deliver to the bank deeds of trust or mortgages and the notes secured thereby in the principal sum of not less than 110 per cent of the face value of all coupon bonds "delivered to it by the Bank," and also 110 per cent of the loan or cash surrender value of the savings bonds; or, in lieu thereof, 100 per cent of said values in cash. In one paragraph of the agreement the company assigned to the bank certain notes, mortgages and deeds of trust described in schedules attached to the agreement. In the agreement it is declared to be "the meaning and intention of the parties that all of the mortgages and deeds of trust and notes thereby secured which shall be deposited and held by the bank at any time, and any cash so deposited, shall be held in trust for the equal pro rata benefit and security of all bonds which shall be delivered duly certified by the bank to the company for said notes, mortgages, deeds of trust and cash." The agreement provides that in case of the company's default in payment of principal or interest or breach of any covenant, all bonds, at the option of the holders of 25 per cent of the outstanding coupon bonds and 25 per cent of the cash surrender value of the outstanding savings bonds, manifested in writing to the bank, shall become immediately due and payable; whereupon the bank shall

sell the securities or collect the notes or foreclose the trust deeds or mortgages, and take all other steps, by suit or otherwise, to protect the rights and interests of the holders of the outstanding bonds. It is provided, also, that a majority in interest of the holders of all outstanding bonds may, by an acknowledged instrument in writing delivered to the bank, direct the bank to waive any default on the part of the company other than a default in the payment of the principal at maturity.

The coupon bonds are in the ordinary form of such bonds, and contain a promise to pay a specified principal sum at a given date, with interest evidenced by coupons. Each of these bonds refers to the trust agreement for the terms and conditions upon which the bond is issued, and provides: "This bond shall not be valid or obligatory for any purpose unless authenticated by the certificate endorsed hereon executed by the trustee."

Each of the savings bonds provides that in consideration of the payment of a specified amount monthly in advance for ninety-nine months, the company shall pay a specified amount to the record owner. Each bond, both coupon and savings, provides that it is subject to the privileges, terms and conditions on the back of the bond. Among the conditions appearing on the back of the savings bonds are these: That the company shall "hold in escrow" with the bank secured notes, etc., in an amount equal to 110 per cent of "the liability or cash surrender value" of the bond; that the holder shall pay to the company $7.50 each month on each $1,000 bond until ninety-nine monthly payments shall have been made; and that should the bond become "permanently delinquent" before the payment of twelve monthly installments, the company shall issue a paid-up bond for the full amount paid in, plus interest. Printed on the bond is a table setting out the loan or surrender value of such bond, which value increases semi-annually according to the number of monthly payments that have been made. Upon the sale of savings bonds, the company, in some instances,

delivered in place of the bond an "interim certificate," reciting that the person named had purchased a certain savings bond, designated by serial number, and reciting the provisions and conditions of the bond.

The certificate to be signed by the bank, as trustee, is printed on the back of each bond. It is as follows: "Trustee's Certificate. It is hereby certified that the within bond is one of the bonds of The Equitable Bond and Mortgage Company described in and secured under that Company's Trust Agreement with this bank...... ........, Trustee." The bonds so certified are referred to in this opinion as certified bonds; the others are referred to as uncertified bonds.

The plaintiffs in error and those persons represented by them are holders of savings bonds and interim certificates that never have been certified.

No coupon bond, savings bond or interim certificate was delivered to the bank for certification prior to its issuance or sale. The company sold such bonds and interim certificates without certification by the bank. After their sale some of the bonds so sold were brought to the bank by the purchasers or by some officer of the company, and were certified by the bank; but the bonds and interim certificates held by the plaintiffs in error and by the persons represented by them were not among them. At the time of the appointment of the receiver, savings bonds creating a liability in an amount in excess of $110,000, and coupon bonds in an amount in excess of $27,000, had been so certified. From time to time the company deposited with the bank, under the trust agreement, securities aggregating the face value of $100,000. Their book value at the date of the appointment of the receiver was $107,097.83. Their actual value, as stated in the stipulation, "is" less than that amount. Discussing that situation, the trial court said: "Whether there was on deposit with said bank, as trustee, at all times, when such 'Savings Bonds' and 'Coupon Bonds' were so certified by the bank, securities of the character

designated in amount equal to 110 per cent of the face or cash surrender values of said bonds certified, or 100 per cent of such values in cash, as required by the trust indenture, does not appear, although it is hardly to be supposed that the bank, as trustee, would have certified the bonds, unless such had been the fact."

At the time of the appointment of the receiver the actual value of the company's assets other than those in the hands of the bank was $10,000. At that time there were outstanding uncertified bonds "in the amount of liability, principal and interest, approximately $95,000." It was stipulated: "That until after October 1, 1930, and immediately prior to the appointment of the receiver herein, said trustee had no knowledge or notice that there had been sold or issued by the company, or were outstanding, any savings bonds or interim certificates other than those which had been certified * * *."

The trust agreement contemplated that the company should deposit its bonds with the bank; that from time to time it would deposit with the bank secured promissory notes of a value equal to the prescribed percentage in excess of the amount of bonds sought to be withdrawn; that thereupon the bank should certify and deliver to the company the bonds so secured by the trust funds so deposited; and that thereupon the company might sell the bonds so certified and delivered to it by the bank. This plan was departed from. The bonds were sold without certification. The purchasers or an officer of the company presented some of the bonds to the bank for certification, and if at that time there was in the possession of the bank, as trustee, securities of sufficient value to protect the bonds so presented, the bank would certify such bonds. So long as sufficient securities were on hand to cover the bonds so certified, this departure from the original plan harmed no one.

Every purchaser of a bond was bound by the terms of the trust agreement, and that instrument made it clear that only certified bonds are secured by the trust funds.

That is made clear by the several provisions of the agreement, the express declaration of intent quoted above, and by the agreement taken as a whole. Any other construction would defeat the very purpose of the trust agreement. Furthermore, it would nullify some of its important provisions; for example, the provision concerning the acceleration of the maturity of the bonds, at the option of the holders of a certain percentage of the outstanding bonds, and the provision concerning the right of the holders of a majority in interest of all outstanding bonds to waive default. The only way in which the bank could determine whether the signers of the declarations presented to it constitute the holders of the required percentage of outstanding bonds would be by examining its list of the bonds certified by it. The bank had no knowledge of bonds sold by the company until they were presented to it for certification.

When the plaintiffs in error and the persons they represent purchased savings bonds, the fact that the bonds were not certified was obvious; the printed form for the certificate was not signed by the bank. They should not have purchased the bonds in that condition. But having purchased them, the holders, if they were unwilling to rely upon the company's mere promise to pay and desired to share in the security afforded by the trust fund, could and should have presented their bonds to the bank for certification. If certification was refused by reason of the company's failure to deposit sufficient securities to cover the bonds, the holders could have demanded of the company a compliance with its promise to "hold in escrow" with the bank securities or cash in the agreed amount. If the company failed to comply with the demand, the holders could have sued the company for a breach of its contract. If the holders purchased in reliance upon any false representations, an action for damages would lie against the one making such representations. But whatever rights the holders of uncertified bonds and interim certificates may have, it is clear that

they have no right to participate in a distribution of the trust fund to the prejudice of the rights of the holders of certified bonds, and the trial court's decision to that effect was not erroneous.

The judgment is affirmed.

MR. CHIEF JUSTICE ADAMS, MR. JUSTICE HILLIARD and MR. JUSTICE BOUCK dissent.

MR. JUSTICE BOUCK, dissenting.

Convinced that the majority opinion discloses a serious misapprehension of the evidence herein, particularly the documentary part of it, and believing that the reasoning based thereon is in consequence so erroneous as to make the decision not only wrong but, in its inevitable effect, unjust, I respectfully dissent. Regretting the necessity of so doing, I proceed to give the story and its meaning as I see it.

The case involves conflicting claims to securities in the hands of the Colorado National Bank of Denver arising in part at least out of a trust agreement which was entered into on December 15, 1924, by and between that bank and the Equitable Bond & Mortgage Company, a Colorado corporation. The company is now in the hands of a receiver. The latter and the trustee bank are the defendants in error. The relevant portions of the trust agreement (the italics are mine) follow:

"Whereas, said Company * * * is issuing and selling its first mortgage bonds secured by deeds of trust or first mortgages on improved real estate * * * and *providing therein that to secure the same the Company will hold in escrow with the Trust Department of said Bank the notes, deeds of trust and mortgages necessary to secure the same;* and

"Whereas, said Bank has consented to *hold in trust* the said notes, etc. * * * *for the benefit of the holders of said bonds issued and to be issued by said Company, as hereinafter set forth;*

"Now * * * this indenture witnesseth * * *

"1. That the Company has issued and will * * * execute and issue its 'Savings Bond' in the forms hereto annexed * * * and also its coupon bonds in the forms hereto annexed * * *

"2. The Company agrees *as security for all bonds delivered to it under this agreement with said Bank's certificate thereto affixed,* to * * * deliver to the Bank, in accordance with the terms of this agreement, deeds of trust or mortgages and the notes secured thereby * * * aggregating * * * not less than 110% of the face of *all coupon bonds delivered to it by the Bank* and also 110% of *the loan or cash surrender value of the savings bonds,* or in lieu thereof 110% of said values in cash. * * *

"3. The Company hereby * * * delivers to said Bank * * * notes, mortgages and deeds of trust * * * described in the schedules hereto annexed * * * in order to secure and provide for the payment * * * of the bonds aforesaid to be issued *and delivered in accordance herewith.* Said transfer is made by the Company *in trust for the equal pro rata benefit and security of all persons* * * * who may have or become the * * * holders of any of the aforesaid bonds, *irrespective of the order of issue, without any preference or priority of any* one bond over another. * * * it being the meaning and intention of the parties that all of the mortgages and deeds of trust and notes thereby secured which shall be deposited and held by the Bank at any time, and any cash so deposited, shall be held *in trust for the equal pro rata benefit* and security of all bonds which shall be delivered *duly certified* by the Bank to the Company for said notes, mortgages, deeds of trust and cash. * * *

"5. * * * once each month the Company shall furnish the Bank with an itemized statement of *its existing liability on all bonds.* * * *"

The plaintiffs in error are interveners who base their claims upon the purchase of certain of the company's savings bonds. I shall first consider the nature of the

*contract* of the company with these individual bondholders. The practice of the company was to issue, in lieu of the savings bond purchased by the intervener, what was termed an interim certificate. The terms and conditions in the latter substantially duplicated those in the bond. By one provision, similar in both, the company expressly promised that "to secure this savings bond the company will hold in escrow with the trust department of the Colorado National Bank of Denver, Colorado, notes secured by deeds of trust or first mortgages on improved real estate; bonds or cash in an amount equal to 110% of the liability or cash surrender value hereof." We have thus, in addition to the usual promise of a bond to pay a certain sum of money, a promise to secure the bond by the deposit of a specified class of securities.

The original purposes of the trust agreement are clear. Thereunder each bond was to be sold by the company only after the latter had presented it in completed form to the trustee bank, and after the bank had certified it and delivered it back to the company; whereupon, and not before, the bond would be ready for purchase from the company by the prospective bondholder. The authors of these provisions manifestly aimed to effectuate the contract for deposited securities, as stated in the bond and the interim certificate. Thereby each bondholder would hold a certified bond, secured pro rata.

In each savings bond and in each interim certificate appears a registration clause. The one in the interim certificate reads: "After twelve monthly payments have been made hereon, this bond *will be registered by the trustee* without charge." *On the face* of the interim certificate in the record herein appears the additional clause: "After twelve monthly payments have been made said bond *will be registered with the Colorado National Bank and delivered to the within named bond purchaser.*" When the forms of bonds and interim certificates were prepared, and also when the trust agreement was signed, the intent undoubtedly was to give equal pro-

tection to all who had the company's aforesaid promise of security. It was not then contemplated that the bond-holders should ever have a higher or lower rank, and a greater or lesser security, according as they might win or lose in a race or scramble to get their respective bonds "registered." Such inequality was not thought of. The "registration" referred to in the various documents was plainly a different thing from the "certificate," though counsel for the defendants in error maintains that they were intended to be—and are—the same. Nothing in the trust agreement lends support to such a contention. The reasonable and natural meaning of the language deci-sively refutes it. If any proof were needed that no check was intended or expected to be made by the bank on the company, or on the company's securities deposited with the bank, paragraph (e) in subdivision 12 of the trust agreement would be conclusive. It states that *"the trus-tee assumes no responsibility"* for the validity of the bonds issued or of the trust agreement, or for the nature, extent or amount of the securities on deposit, nor for the truth or falsity of recitals of fact in the bonds or the trust agreement, or of any statement of value or ap-praisal authorized or required of the company, or any of many other matters. Indeed, the only responsibility assumed by the bank is for the custody and handling of the securities and, in case there is a liquidation of those securities, of the proceeds thereof.

There would have been, as already stated, perfect equality of bondholders in accordance with the original intent if the procedure contrived in the trust agreement had been applied. Instead of applying it, however, the company and the bank discarded that procedure alto-gether in so far as it governed the selling of certified bonds. The bonds were sold direct by the company *with-out the bank's certificate.* The bank saw none of them except (according to the testimony of the bank's trust officer, who had the matter in charge) *as some were brought to it by the company after they had been issued*

*and sold.* In such instances the blank certificate on the bond was possibly filled out and signed by the bank; if so, it was done *not in compliance with the trust agreement,* however, but gratuitously and without the slightest authority from it for certifying after the bond had been sold or issued; in many instances, if not all, long after the interveners had paid value in good faith. Not a single bondholder holds a bond certified *before sale* as the trust agreement required. Not one therefore has a right to obtain a preference through reliance upon some technical or merely formal advantage; it cannot be done without violating the fundamental principles of equity. To award such a preference is to make a new contract for the parties.

It is to be noted that neither the savings bond nor the interim certificate declares or intimates that either "registration" or "certification" is obligatory in order to entitle the holder to enjoy his security. No information was conveyed by either of the two instruments as to what effect, if any, "registration" or, for that matter, "certification" would have. There was no hint that either "registration" or "certification" might have the slightest connection with the question of time, method or assurance of payment. For all we know from the record, the "registration" or even the "certification" might merely establish the prima facie genuineness of the bond or the prima facie title to it.

The majority opinion seems to argue that the securities cannot be participated in by bonds not "registered" or "certified" because no securities were deposited except to cover the bonds that did receive "registration" or "certification"; and that the latter act was the only means the bank possessed of keeping the bonds within the limit of securities deposited by the company. It has been shown that the bank acknowledged no such duty. Nor was such duty imposed upon it. It voluntarily ignored the provision requiring it to affix its certificate to bonds *before* they were sold. If that certificate had been

affixed under the trust agreement, *before sale,* the bank could not possibly get information thereby. On the contrary, it evidently relied for its information upon subdivision ''5'' of the trust agreement, quoted in the beginning. We must assume that the company did actually furnish to the bank *each month* the required ''itemized statement of its existing liability on all bonds.'' The bank had no duty to see that the bonds sold did not exceed the total of securities deposited. By paragraph (e) in subdivision 12 of the ''trust agreement'' it had expressly guarded against that.

Since none of the bondholders has obtained a valid preference in any way prescribed or recognized by the express terms of the trust agreement, the securities constitute a trust fund which ought to be administered by this court.

The foregoing discussion can lead to but one conclusion: that full effect ought to be given to the original intent, that of giving all the bondholders the same right to a pro rata share of the securities deposited with the bank. ''Equality is equity.'' 1 Pomeroy, Equity Jurisprudence (3d Ed.), section 406. In the present case the application of this time-honored maxim of chancery coincides with the actual contract rights of the parties. And, in aid of those contract rights, this court ought not to hesitate in applying that other salutary maxim which enables it even now to enforce them equitably under the circumstances of the case before us: ''Equity regards that as done which ought to be done.'' Id., §§364 et seq. The judgment should, in my opinion, be reversed and the case remanded for further proceedings by which a pro rata distribution might be effected among all the bondholders according to the promise made to them by the company.

Mr. Chief Justice Adams and Mr. Justice Hilliard concur in this opinion.